Jon D. Graves, Legal Counsel, SC #10554
Hutchinson Correctional Facility
P.O. Box 1568
Hutchinson, KS 67504-1568
Telephone: (620) 625-7253
Jon.Graves@ks.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| RYAN CHRISTOPER CHEATHAM | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 25-3241-JWL |
| | ) | |
| TIM EASLEY (LSCF WARDEN), | ) | |
| (fnu) GRAHAM (LSCF MAJOR), | ) | |
| (fnu) BIEBERLE (LSCF CAPTAIN), | ) | |
| (fnu) COBB (LSCF CORRECTIONAL | ) | |
| OFFICER), (fnu) HOPKINS | ) | |
| (LSCF CORRECTIONAL OFFICER), | ) | |
| and (fnu) FORD (LSCF | ) | |
| CORRECTIONAL OFFICER) | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## REPORT IN "MARTINEZ v. AARON" INVESTIGATION

## CIVIL RIGHTS COMPLAINT

On November 6, 2025, plaintiff Ryan Christopher Cheatham filed a pro se civil rights

action pursuant to 42 USC §1983 in the United States District Court for the District of Kansas.

(Doc. 1)  Plaintiff was an inmate incarcerated in the custody of the Secretary of Corrections of

1

the State of Kansas and was housed at all relevant times at the Larned State Correctional Facility (LSCF).

On December 22, 2025, the Court issued an order directing the preparation of a Martinez report and also a service order. (Doc. 6 & 7)

### SUMMARY OF ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED PETITION

Plaintiff is an inmate presently housed at the El Dorado Correctional Facility (EDCF) and was housed at LSCF at the time his cause of action arose on July 4, 2025. (Doc.1, p.3 and Exhibit 1)

Plaintiff first recites a series of facts.

Plaintiff names as defendants LSCF Warden Tim Easley, LSCF Major James Graham, LSCF Captain Ronald Bieberle and LSCF correctional officers Anthony Hopkins, Aaron Cobb and Jacob Ford. Plaintiff doesn't list warden Easley in the appropriate place in the petition as a defendant, but does name him in the caption of the petition. (Doc. 1, p. 1-3)

On July 4, 2025, plaintiff alleges defendants Easley, Graham and Bieberle authorized a use of force to be conducted against him. (Doc. 1, pp. 3, 5)

Plaintiff alleges that he had his hands in the air in a submissive position when defendant Cobb ordered defendants Hopkins and Ford to shoot plaintiff with pepper balls while plaintiff had his back turned, still with his hands up, injuring his back and back of his head, leaving him bruised and bleeding.   (Doc. 1, p.5)

Plaintiff says he should have been directed to step to the bean port to be restrained or ordered to lie down, but instead the defendant officers followed directives to cause him pain and

harm instead of restoring order. Plaintiff suggests that at the time the shoots began, he was not engaged in active violence nor did he have a weapon in his hands at the time the shots started. (Doc. 1, p. 5)

Plaintiff alleges the force used was excessive and violated his eighth amendment rights using cruel and unusual punishment. He suggests defendants were deliberately indifferent and also violated his right to equal protection of the law.(Doc. 1, p. 5)

Plaintiff also states, without further explanation that he was subjected to an excessive use of force in violation of his 8th and 6th amendments (Count 1), that the excessive use of force against him was cruel and unusual and violated his 8th amendment rights (Count II) and that his 8th amendment rights were violated due to deliberate indifference (Count III). (Doc. 1, pp. 3, 5, 6)

Plaintiff implies he has exhausted his administrative remedies, but doesn't attach or identify any such proof.  He does reference exhibits filed in "Howes case".  Plaintiff does reference case number 25-3091, which does list a defendant with the last name of Howes.  That case was filed on May 12, 2025, sometime before the July 4, 2025, event named in plaintiff's petition.  It is not clear why any papers attached to that lawsuit would prove exhaustion of administrative remedies in this one. (Doc. 1, pp. 6-7)

Plaintiff indicated all defendants were acting under color of state law except he does not do so regarding Tim Easley unless Easley is correctly named as a defendant. (Doc. 1, p. 1-3)

Plaintiff's request for relief states as follows:

Plaintiff seeks $500,000 for violation of his constitutional rights, for emotional and mental damages and for punitive damages. He also seeks any other damages to which he is entitled. (Doc. 1,, pp.6-7)

## UNCONTROVERTED STATEMENT OF FACTS

### I.    PLAINTIFF POST FILING INFORMATION

Plaintiff, Ryan Christopher Cheatham has two active felony convictions for voluntary manslaughter and for possession of a firearm by a felony.  Plaintiff also has convictions for attempted robbery (2) and for sale of narcotics.  Plaintiff has received 14 disciplinary violations since his most recent incarceration began on April 1, 2024, twelve of which were Class I violations, the most serious kind. That includes violations for disobeying orders and for Threatening or intimidating arising out of the July 4, 2025, incident. Plaintiff is currently housed in the special management unit at the El Dorado Correctional Facility. Petitioner's earliest possible release date is presently April 19, 2030.  (See Kasper Sheet Exhibit 1)

### II.    USE OF FORCE AGAINST PLAINTIFF JULY 4. 2025

Use  of Force Report 2026-08-0001 covers the use of force against plaintiff beginning at 7:40 a.m. on July 4, 2025, at LSCF after plaintiff refused to allow himself to be restrained when it was time for him to leave the segregation exercise yard.  Six facility staff were involved and were identified as Corrections Officer I Tyler Madewell, Correction Officer II Odane Bernard and Correction Supervisor Is Tanner Lang, Anthony Hopkins, Jacob Ford and Aaron Cobb. NOTE: Only CSIs Jacob Ford, Anthony Hopkins and Aaron Cobb are named as defendants. The planned use of force was authorized by Tim Easley and discussed with Ron Bieberle, who was the shift supervisor. These two are also named as defendants. (Exhibits 2, 4 and 14)

The entire event is recorded by audio and video by Corrections Supervisor II Angie Lines. (Exhibits 5, 8, 14 and 17-18)

Three photographs were also taken by Aaron Cobb immediately after the use of force and three more were taken while plaintiff was in crisis level cell. (Exhibit 19 and 20)

The reason for the use of force was because at around 7:40 a.m. plaintiff refused to be restrained and returned to segregation.  Plaintiff had a weapon (wire from the fencing wrapped around his fingers) and plaintiff threatened staff if they entered his exercise area. (Exhibits 2, 5(Attachment A), 12 and 14)

All other inmates were ultimately removed from the exercise yard, which was a series of wire fence  enclosures. (Exhibit 12)

A series of staff attempted to negotiate with plaintiff to allow himself to be restrained and to return to his living unit.  CSII Lines first negotiated with plaintiff from 7:33 a.m. to 7:44 a.m. and again from 9:50 a.m. to 9:55 a.m.. CSI Cobb negotiated with plaintiff from 8:32 a.m. to 8:50 a.m. and CSIII Bieberle also engaged plaintiff from 8:39 a.m. to 8:45 a.m..  Plaintiff was allowed to remain in the exercise yard for an extra hour until 9:00 a.m. Lastly, corrections Officer I Kim Converse began negotiations at 9:57 a.m..  Negotiations were determined to have failed at 10:01 a.m.. Plaintiff indicated he would not cooperate and return to his room. Plaintiff was now ignoring the negotiator, was chanting loudly and would not make any eye contact with her. Plaintiff had also wrapped his head and face to protect against OCS spray from getting in his eyes and was wearing extra clothing. The negotiator stepped away. (Exhibits 2, 4, 5, 8, 9, 12, 14, 17 and 18)

The security videos show the entire use of force including the assembly of the team, the final negotiation, the uses of force, the movement of plaintiff from the enclosure to his

decontamination shower, the medical check and, in the second short video, to his crisis level cell. (Exhibits 17 and 18)

The first volley of pepper balls were deployed by CSIs Hopkins and Lang at 10:02 a.m.. CSI Lang indicated he deployed 6 rounds into plaintiff's torso and upper arms. Plaintiff refused to be restrained. A second volley was deployed at 10:04 a.m.. CSI Lang deployed another 6 rounds to plaintiff's upper torso. Plaintiff still refused to be restrained. A third volley was deployed at 10:05 a.m. and plaintiff complied, allowing wrist and ankle restraints to be applied.. Plaintiff was removed from the exercise yard at 10:09 a.m. and taken to housing unit COU-5. Plaintiff's clothing was removed and he was given a security gown and security blanket. Plaintiff received a 10 minute decontamination shower. (Exhibits 6, 10, 12, 14, 17 and 18)

CSI Lang returned 78 pepper balls to Central after deploying 12 pepper balls. CSI Hopkins deployed 55 pepper balls overall and returned 35 pepper balls to Central. It appeared that only a handful of the pepper balls actually got through the fence intact so they impacted on plaintiff. (Exhibits 6, 10, 14, 17 and 19)

Neither plaintiff nor staff reported any injury. Plaintiff refused medical treatment in a statement to Registered Nurse Williams, stating specifically that "I'm good Ms. Williams, I'm good.". The use of force report and attached medical record both contain a copy of the four page record with that information. The medical record contained no other mention of injury or treatment of plaintiff related to this use of force so far as counsel could determine. The medical record from June 1, 2025, to present is also attached. The relevant four page medical record is attached to the use of force report. (Exhibits 5, 13, 14, 15 and 17)

Plaintiff was placed on a four day suicide observation. (Exhibit 16)

### III.    WITNESS STATEMENTS

### 1.    Statement of Defendant Warden Tim Easley

Plaintiff sued Defendant Warden Tim Easley (Easley) because Easley approved the use of force to be conducted against plaintiff.  Easley agrees that he did approve the use of force against plaintiff and engaged in further discussion with Defendant Captain Ronald Bieberle on various matters including the type of force to be used.

The exercise area is a series of wire enclosures.  Options for uses of force included chemical spray, pepper balls and physical intervention.  The spray was not the best selection because it was in open air and would dissipate quickly and could contaminate the entire exercise area, requiring significant clean up before the area could be used again.  Physical intervention was not a preferred option for a variety of reasons.  The enclosure was large enough that plaintiff could run around and avoid the five man team, as well as risking injury to staff from the physical confrontation.  The physical  approach works much better in small, confined cell areas.  The use of pepper balls seemed best because it could be better focused on plaintiff, would have much less clean up and the risk of injury to staff was minimized.

Plaintiff should have been returned to his living unit a little after 7:00 a.m., but it was after 10:00 a.m. before force was actually used. We tried to give plaintiff time to change his mind and voluntarily return to his living unit, but he came to the exercise area with the apparent intent to engage in a use of force, based on his choice to wear extra clothing and by concealing his face to protect against the use of chemical agents.

Beside allowing him to remain long past the scheduled time for him to leave the exercise yard, four different staff attempted to negotiate with plaintiff to leave voluntarily.  Lt. Lines spoke with plaintiff from 7:33 a.m. to 7:44 a.m., M. Sgt Cobb from 8:32 a.m. to 8:50 a.m.,

Captain Bieberle from 8:39 a.m. to 8:45 a.m., Lt. Lines again from 9:50 a.m. to 9:55 a.m. and finally COI Converse from 9:57 a.m. to 10:01 a.m..   Even as the team appeared and the use of force began, CSI Cobb asked plaintiff to allow restraints to be placed on him, and multiple times thereafter, even allowing more time to pass, hoping the delay would change plaintiff's mind.

Pepper ball technology is much like paintballs except for the contents when the balls burst.  The guns firing the pepper balls are similar to paintball guns.  The pepper balls can cause some bruising, but the risk of serious injury, as might be the case with bean bags, is not the same. And, pain compliance combined with the contents of the pepper balls has proven effective.

CSI Lang and CSI Hopkins did deploy a series of pepper balls and then waited two minutes for the chemical to take effect.  Plaintiff was again asked to cuff up and refused.  A second volley was utilized and plaintiff seemed for a moment like he was going to comply, then walked away from the door through which he would have been restrained.  More pepper balls were fired by CSI Hopkins and plaintiff gave up and agreed to be restrained.  No further pepper balls were fired once he complied with instructions and was then restrained.

Plaintiff's choice to remain in the exercise yard past his allowed time interfered with the schedules for other inmates to use the area and required additional staff to supervise and move other inmates out of the area before the use of force was conducted.

A use of force review committee comprised of Warden Easley and senior staff from a variety of departments looked at video of the situation as it unfolded and concluded the force used was both reasonable and necessary.

Warden Easley's approval of the use of force against plaintiff and the use of force itself were a correct, reasonable and appropriate response to the situation. The decision to use the pepper ball guns instead of rushing in to physically restrain plaintiff was the best for all involved.

Both security staff and plaintiff could have been injured in such a case. As it was, plaintiff received only the most minor of injuries, no staff were injured and plaintiff received immediate medical care and confirmed to the nurse that he was alright. This use of force was not used purely to cause plaintiff pain, but was intended to restore discipline to the area and to allow the exercise yard to return to normal after he was returned to his living area or, in this case, placed in crisis level housing. (Exhibit 2)

### 2. James Graham

Major James Graham is named as a defendant because he authorized the use of force against plaintiff on July 4, 2025. Major Graham indicates he did not authorize the use of force against plaintiff on July 4, 2025. Warden Easley was the one who authorized the use of force. (Exhibit 3)

### 3. Ron Bieberle

Captain Ron Bieberle was named as a defendant by plaintiff because he authorized the use of force against plaintiff.

Captain Bieberle indicates that Warden Easley authorized the use of force against plaintiff on July 4, 2025, but that the captain was aware of the issues with plaintiff's behaviors and did discuss it with the warden. It did appear that other inmates in that exercise area were going to be resistant also, but they decided to cooperate and allow themselves to be restrained.

The captain and warden did discuss the use of force options including physical intervention, use of chemical spray vapor and pepper balls fired from a gun.

Physical intervention was the last option. Captain wanted to avoid possible injury to staff. Plaintiff was initially armed with a wire weapon. Also, the enclosure plaintiff was in was

much bigger than a cell and a five-man team could have problems controlling plaintiff since he could move around the enclosure more easily.

Chemical spray was a problem since it was gusty outside and the spray would potentially contaminate the exercise yard enclosures and require considerable time to decontaminate area after use.

Pepper balls seemed the best option since they could be more precisely focused on plaintiff and would require less clean up effort.

Captain  Bieberle did not want to see the use of force occur on the July 4th holiday because that would cause plaintiff to miss the special food items available that day.  To that end, Captain Bieberle allowed plaintiff much additional time beyond his scheduled exercise time to comply with the requirement he be restrained before he was moved back to his living unit. Multiple additional staff attempted to negotiate with plaintiff to comply with orders so he could be returned to his living unit.  The captain also spoke with plaintiff for six minutes, from 8:39 a.m. to 8:45 a.m., in an unsuccessful effort to obtain compliance. (Exhibit 4)

### 4.  Angie Lines

Lt. Angie Lines was assisting Captain Bieberle supervise LSCF on the 6:00 a.m. to 2 p.m. shift on July 4, 2025.  She spoke to plaintiff twice, from 7:33 a.m. to 7:44 a.m. and again from 9:50 to 9:55 a.m., to convince him to allow himself to be restrained and removed from the segregation exercise yard.  When all attempts to convince plaintiff to cooperate, she was present and operated the video camera, which also made an audio record of what transpired. She also prepared a report of what transpired that day at the facility, including a paragraph about plaintiff's actions.  That report is attached to her affidavit. (Exhibit  5)

### 5.  Aaron Cobb

Corrections Supervisor I Cobb was assigned to the team assembled to remove plaintiff from the exercise area on July 4, 2025.  Plaintiff named CSI Cobb because Cobb ordered the two team members operating the pepper ball guns to shoot plaintiff while he had his hands up with his back turned, injuring his back and head, leaving him bruised and bleeding.

CSI Cobb explained that he had a variety of roles involving the use of force against plaintiff.  Initially, before the team was assembled, CSI Cobb spoke to plaintiff from 8:32 a.m. until 8:50 a.m. to convince plaintiff to submit to restraints and leave the segregation exercise area voluntarily.  After that effort was unsuccessful, CSI Cobb performed unrelated task until he was called to be a part of the team assembled to remove plaintiff from the exercise area.

CSI Cobb was to document everything that occurred regarding the use of force and prepared the Use of Force Report 2026-08-0001, also attached to this Martinez Report.  CSI Cobb was also to direct the team members as the use of force was conducted, but had no physical role.

After COI Kim Converse attempted to convince plaintiff to cooperate, from 9:58 a.m. to 10:01 a.m., CSI Cobb gave plaintiff a final opportunity to voluntarily "cuff up", then CSI Cobb directed two team members, CSI Tanner Lang and CSI Anthony Hopkins to enter the exercise enclosure next to plaintiff.  Then CSI Cobb directed both men to deploy their pepper ball weapons, then to stop and allowed a couple of minutes for the PAVA powder in the pepper balls to take effect and asked plaintiff to voluntarily cuff up again.   CSI Cobb then instructed the two officers to again deploy their pepper balls. Plaintiff then seemed to pretend he was going to cooperate and then stepped away from the door again.  CSI Cobb instructed CSI Hopkins to remain on target and additional pepper balls were deployed.  Then plaintiff did actually present himself at the door of the enclosure and permitted himself to be restrained.

CSI Cobb did assist in escorting plaintiff to a decontamination shower and supervised the shower and subsequent movement of plaintiff to a crisis level cell.  CSI Cobb directed that plaintiff's shirt be cut off since he still had handcuffs on and those would not be removed until he was in the shower with the door locked.  Plaintiff 's pants and underwear were removed after the leg restraints were removed.  After the shower was completed, plaintiff was finally placed in a crisis level cell.

CSII Angie Lines operated the video camera from the time the team was assembled until plaintiff was in a crisis level cell. His injuries from the pepper balls were documented with video and CSI Cobb took three photos of the injury.  Three more photos were taken over the next days as required by policy regarding plaintiff's crisis level placement. (Exhibits 8 and 19)

### 6.  Kim Converse

COI Kim Converse was directed to negotiate with plaintiff about voluntarily submitting to restraints.

At 9:58 a.m. on July 4, 2025, she began speaking with plaintiff.  He ignored COI Converse and was chanting.  As the negotiations continued, plaintiff ignored COI Converse, would not make eye contact with her and chanted louder. At 10:02 a.m. she determined that the negotiation attempts had failed and stepped away so that the use of force could proceed. (Exhibit 9)

### 7.  Jacob Ford

CSI Jacob Ford was named in plaintiff's lawsuit as one of the two officers who operated the pepper ball guns that were used to deploy the pepper balls.  CSI Ford states he was assigned to the use of force team assembled to remove plaintiff from the segregation exercise area, but indicates that he was directed to control one of plaintiff's legs after entering the enclosure to

forcefully restrain plaintiff, but that CSI Ford was not assigned to operate a pepper ball gun. Plaintiff is mistaken in this regard.

CSI Ford observed the use of force being conducted and then restrained plaintiff's wrists when he came to the door and placed his hands through the opening to be restrained. CSI Ford escorted plaintiff to the decontamination shower and held his left arm to guide him into the shower. After a ten minute shower, CSI Ford assisted plaintiff out of the shower and to plaintiff's living area where he was examined by medical staff. Plaintiff was finally placed in the crisis level cell where CSI Ford held plaintiff's restraints while COII Bernard removed them. (Exhibit 7)

### 8. Tanner Lang

Corrections Supervisor I Tanner Lang was assigned to the cell extraction team, assembled for the purpose of removing plaintiff from the segregation exercise yard. CSI Lang was responsible for controlling one of plaintiff's arms and for placing handcuffs on plaintiff.

At the briefing prior to the use of force, it was announced that pepper ball guns would be used and Lang was assigned to use one of the two. CSI Anthony Hopkins was assigned to use the other.

SCI Lang and CSI Hopkins were ordered to enter the exercise enclosure on one side of plaintiff. After plaintiff was again asked to submit to restraints and refused to do so, CSI Lang was ordered to fire his gun and fired six pepper balls. He waited two minutes to let the effect of the pepper balls work. Plaintiff was ordered to cuff up and again refused.

CSI Lang and CSI Hopkins were ordered to fire again and CSI Lang fired six more pepper balls into plaintiff's upper torso. CSI Hopkins fired also and then fired another volley. Then plaintiff allowed himself to be restrained. CSI Lang accompanied plaintiff to a

decontamination shower and saw him placed into a cell. Plaintiff was examined by Nurse Williams and had no injuries beyond some bruising. CSI Lang had been issued 90 pepper balls and returned 78 pepper balls to the armory. (Exhibit 10)

### 9. Anthony Hopkins

Corrections Supervisor I Anthony Hopkins was named as a defendant because he allegedly continued to shoot plaintiff with pepper balls after plaintiff had raised his hands and wanted to allow himself to be restrained. CSI Hopkins was a part of the cell extraction team which was to remove plaintiff from the segregation exercise area and was to be responsible for one of plaintiff's arms.

During the briefing, the team was advised that pepper balls would be used instead of physical intervention and CSI Hopkins was assigned to use the other pepper ball gun. After negotiations failed at 10:01 a.m. on July 4, 2025, CSI Hopkins fired rounds of the pepper balls at plaintiff's back and arms and stopped. After two minutes and more discussion, CSI Hopkins was ordered to discharge more rounds. At 10:05 a.m. plaintiff gave up and allowed himself to be restrained.

CSI Hopkins deployed a total of 55 pepper balls toward plaintiff during that use of force and returned 35 to the armory. CSI Hopkins stepped back from the fence to be sure plaintiff was not able to grab the barrel of the weapon. As a result of doing so, a number of the pepper balls hit the fence and exploded without getting through to strike plaintiff. CSI Hopkins fired the relatively large number of pepper balls to be sure some got through the fence and struck plaintiff.

CSI Hopkins advises he did not do so to cause plaintiff unnecessary discomfort beyond that necessary to cause him to allow himself to be restrained. The decision to use pepper balls

minimized the risk of injury to members of the team and seemed the correct choice under the circumstances. (Exhibit 6)

### 10. Odane Bernard

Odane Bernard is a Correctional Officer II employed at the Larned State Correctional Facility. COII Bernard was one of the team assigned to remove plaintiff from the segregation exercise yard. COII Bernard and the other team members were briefed at 9:55 a.m. and arrived at 9:57 a.m..

COII Bernard saw the negotiations begin at 9:58 a.m. and were determined to have failed at 10:01 a.m.. Even after that and before pepper balls were used, staff again tried to convince plaintiff to allow himself to be restrained and to return to his living unit.

At 10:02 a.m. plaintiff was shot with pepper balls and still refused to be restrained. At 10:04 a.m. plaintiff was again shot with pepper balls and at 10:05 a.m. plaintiff allowed himself to be restrained.

COII Bernard and COI Tyler Madewell removed clothing from around plaintiff's head and face. COII Bernard assisted in placing handcuffs on plaintiff, assisted in escorting plaintiff to segregation where plaintiff received a decontamination shower and was assessed by nursing staff. COII Bernard did not observe any injury to plaintiff beside bruising from pepper balls and from the exposure to chemicals from the pepper balls. COII Bernard also heard plaintiff tell the nurse that he was alright. (Exhibit 23)

### 11. Penny Riedel

Corrections Manager I Penny Riedel is the keeper of the records of grievances and property claims initiated at LSCF. She found no property claims filed by plaintiff and found one Grievance number IA-003461.

Plaintiff initially filed the grievance directly with the central office of the Kansas Department of Corrections in Topeka, received by them on August 7, 2025.  Plaintiff also had attached to the grievance a Form 9 communication dated July 29, 2025.  The grievance was returned to the warden's office with instructions as set forth in a letter dated August 11, 2025.

Upon arrival at LSCF the grievance was partly investigated by CMI Riedel, but then misplaced and forgotten until plaintiff's lawsuit caused a request for the grievance and it was discovered.  It was then promptly investigated and responded to on December 31, 2025.

In August of 2025, the Kansas Department of Corrections had just started to switch over to a new system for many administrative functions of the department, including grievances, which apparently resulted in the grievance being misplaced.

CMI Riedel works in the living units daily and had numerous contacts with plaintiff regarding issues with other grievances, but never about Grievance IA003461 nor about the July 4, 2025, use of force. (Exhibits 11 and 22)

It should be noted that team member Corrections Officer I Tyler Madewell is no longer employed  by the state.  An unsworn statement by COI Madewell is included in the Use of Force Report. (Exhibit 14)

## IV.    MISCELLANEOUS DOCUMENTS AND THINGS

### A.  Disciplinary reports

Plaintiff received one disciplinary report on July 4, 2025.

Plaintiff received report 25-0545 for disobeying orders and threatening or intimidating at 7:50 a.m. on July 4, 2025.  This was directly related to his refusal to leave the segregation exercise area on July 4, 2025. Plaintiff pled guilty to both charges. (Exhibit 12)

### B.  Medical Records

Plaintiff's medical and mental health records, from June 1, 2025 to December 24, 2025, are attached hereto.  The only relevant entry is found on July 4, 2025, immediately after the use of force, when he advised the examining nurse that he was good and denied any issues, problems or concerns  (Exhibits 13 and 14)

After plaintiff's placement on mental health crisis level, an observation log was created for him until he was removed on October 7, 2024. (Exhibit 16)

Because of his placement on crisis level, plaintiff was put on finger food diet only. (Exhibit 16)

Three photos were taken of plaintiff while in the crisis level cell. (Exhibit 20)

### C.  Grievances

Penny Riedel has explained the circumstances surrounding the failure of the facility to timely respond to Grievance IA0003461. (Exhibit 11 and 22)

### D.  Policy

Internal Management Policy and Procedure 12-111A regarding use of force by staff. This document is designated as "Staff Read Only" and cannot be provided to plaintiff for his review.  It is provided to the Court as a sealed document with a protective order.  Plaintiff will not be provided a copy of this policy. (Exhibit 21)

### E.  Contact Chrono Report

Plaintiff's chronological report, from June 1, 2025 until November 19, 2025, contemporaneously prepared by his unit team counselor when each interaction occurred, reflects nothing relevant to this legal action. (Exhibit 15)

### F.  Security Video and photos of Use of Force

Lt. Angie Lines operated a handheld video camera and recorded over half an hour of video from the time the team was assembled to remove plaintiff from the segregation exercise yard until his decontamination shower was completed.  A short second video shows plaintiff being unhandcuffed after he was in the crisis level cell.  (Exhibits 5, 17, 18 and 19)

## <u>CONCLUSION</u>

Plaintiff sued Warden Easley, Major Graham and Captain Bieberle because they authorized the use of force against him.  Warden Easley actually authorized the use of force. Major Graham was not involved in the entire matter.  Captain Bieberle talked with Warden Easley about the use of force options, but did not authorize the use of force.  Major Graham and Captain Bieberle would seem to have been wrongly accused.

Plaintiff sued Corrections Supervisor I Cobb because he ordered Corrections Supervisor I Anthony Hopkins and Corrections Supervisor I Jacob Ford to shoot plaintiff with pepper balls after he had raised his hands and agreed to be restrained.  CSI Cobb was in charge of directing the use of force.  The security video shows that as soon as plaintiff gave up, CSI Cobb gave no further orders to shoot plaintiff.  Video and photos show that, although 67 pepper balls were deployed, only a handful of the balls actually impacted plaintiff, likely due to firing through the fence.

CSI Ford was not one of the two officers using the pepper ball guns.  CSI Hopkins and CSI Tanner Lang were the two officers charged with using the pepper ball guns.  CSI Ford appears to have been wrongly accused.

The security video provides a clear audio and video record of everything that occurred except for the lengthy attempts to talk plaintiff into allowing himself to be restrained and return to his living area.

It appears to this counsel that extraordinary restraint was exercised by everyone involved except plaintiff in trying to resolve the issue of removing plaintiff from the exercise yard without using force. Plaintiff singularly refused to allow that to happen. Even after the uses of force, plaintiff was promptly decontaminated and escorted to a crisis level cell. The force used appears to be the minimum necessary under all the circumstances. Plaintiff suffered no serious injury and actually advised the examining nurse that he was "good". Plaintiff received no medical treatment at all because none was necessary.

The Court has the opportunity to personally view the security video/audio of what actually transpired in the use of force on July 4, 2025, and to decide, for screening purposes, if plaintiff is entitled to proceed with his case.

Respectfully submitted,


 /s/ Jon D. Graves
Jon D. Graves #10554




CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following: Attorney General, Memorial Bldg., 2nd Floor, 120 S.W. 10th Ave., Topeka, KS 66612-1597 and by mailing a copy to:

Ryan Christopher Cheatham #2000064842
El Dorado Correctional Facility
P.O. Box 311
1737 SE Highway 54
El Dorado, KS  67042

/s/ Jon D. Graves
Jon D. Graves

## EXHIBIT LIST

1.    Inmate Data Summary sheet for plaintiff Ryan Christopher Cheatham
2.    Affidavit of Tim Easley
3.    Affidavit of James Graham
4.    Affidavit of Ronald Bieberle
5.    Affidavit of Angie Lines
6.    Affidavit of Anthony Hopkins
7.    Affidavit of Jacob Ford
8.    Affidavit of Aaron Cobb
9.    Affidavit of Kim Converse
10.   Affidavit of Tanner Lang
11.   Affidavit of Penny Riedel
12.   Disciplinary Report 25-0545
13.   Medical Record for June 1, 2025 to present (approximately December 24, 2025) (On Thumb Drive. Plaintiff will be allowed to view, but not possess the Thumb Drive, filed conventionally and under seal)
14.   Use of Force Report 2026-08-0001
15.   Chrono Report June 1, 2025 – November 19, 2025
16.   Behavioral Health Services Monitoring Packet from July 4, 2025, to July 8, 2025
17.   Security Video of Use of Force (Plaintiff will be allowed to view, but not possess the Thumb Drive of the video for security reasons- filed conventionally and under seal)
18.   Security Video of plaintiff being unrestrained in crisis level cell(Plaintiff will be allowed to view, but not possess the Thumb Drive of the video for security reasons- filed conventionally and under seal)
19.   Three photos taken by Aaron Cobb immediately after the use of force
20.   Three photos taken at three different times while in a crisis level cell
21.   Internal Management Policy and Procedure 12-111A (filed under seal and with protective order)(Plaintiff cannot view or possess for security reasons-staff read only document)
22.   Grievance IA-003461
23.   Affidavit of Odane Bernard


I, Jon D. Graves, certify that the attached are true and correct copies of records kept in the normal course of business by the Kansas Department of Corrections and the published Kansas Statutes Annotated, Kansas Administrative Regulations, Kansas Department of Corrections

Internal Management Policy and Procedures, and Larned State Correctional Facility General
Orders


/s/ Jon D. Graves_____                                    ____February 5,__2026__
Jon D. Graves                                                            Date



        Subscribed and sworn to before me this _5th_ day of February, 2026.



                                    __/s/ Rhonda K. Severin_____
                                        Notary Public

My Commission Expires:  _11-18-2026____