# AFFIDAVIT

**State of Kansas**    )
                       )    ss:
**County of Pawnee**   )

I, Tim Easley, Warden at the Larned State Correctional Facility (LSCF), being duly sworn according to law upon my oath, do hereby depose and state as follows:

1. My name is Tim Easley, and I am employed by the State of Kansas Department of Corrections, currently serving as warden at LSCF. I began my employment with the state of Kansas on November 4, 1996, was appointed acting warden of LSCF in 2019 and became the permanent warden shortly thereafter.

2. I understand inmate Ryan Cheatham named me as a defendant in his lawsuit arising out of the use of force against him on July 4, 2025, after he refused to return to his living unit after the one hour exercise period in the segregation yard had ended.

3. I understand that Mr. Cheatham named me as a defendant because I authorized the above referenced use of force against him. I did do so.

4. Mr. Cheatham's exercise period on July 4, 2025, was to begin early morning and was for an hour. Mr. Cheatham refused to return to his housing unit when his time had expired. He was allowed to remain an additional hour while different staff tried to encourage him to return to his living unit. Lt. Lines negotiated with Mr. Cheatham from 7:33 a.m. to 7:44 a.m. and again from 9:50 a.m. to 9:55 a.m.. Master Sergeant Cobb talked with Cheatham from 8:32 a.m. to 8:50 a.m.. Captain Bieberle spoke with Mr. Cheatham from 8:39 a.m. to 8:45 a.m.. Shortly before the use of force was begun, Corrections Officer I Converse made a last attempt at talking Mr. Cheatham into returning to his housing unit, speaking with him from 9:57 a.m. to 10:01 a.m.. All attempts at negotiating were unsuccessful.

5. Mr. Cheatham had apparently planned this in advance, wearing extra clothes and by concealing his face to protect against the use of chemical spray.

6. The segregation exercise area is a series of ten outside wire enclosures. The design permits one or two officers to observe and manage a number of inmates in the enclosures at the same time.

EXHIBIT 2

7. The possible uses of force include the chemical spray, the pepper balls and physical intervention. The use of chemical spray was not practical since the location was outside, plaintiff had covered his face and the use of the spray would likely have occasioned significant cleanup because it could drift around in the air and contaminate the other exercise enclosures. Physical intervention increased the risk of injury to the inmate and to staff. Mr. Cheatham had wire wrapped around his hands with wire ends poking out which would have increased the risk of injury to staff. Given those options, the use of pepper balls was the best choice. They would not likely contaminate the rest of the exercise area and could be focused onto Mr. Cheatham.

8. The inmate had been allowed to remain an additional hour in an attempt to avoid the need for a use of force, but he seemed determined to disobey the order that he return to his living area. Even after the additional hour, he remained more than another hour as negotiations were conducted. I felt that the delay in the use of force was much more than reasonable and gave Mr. Cheatham every reasonable chance to change his mind and do as he was instructed. Mr. Cheatham's continued presence in the exercise area interfered with the schedules for other inmates to utilize that area. Inmates in this exercise area must be constantly supervised, so even if Mr. Cheatham was allowed to remain for an extended period, security staff would still have to be present. Further, because of Mr. Cheatham's actions, the other inmates had to be removed and escorted individually to their living units and no new ones could be brought in.

9. A use of force review committee comprised of me and senior staff from a variety of departments looked at video of the situation as it unfolded and concluded the force used was both reasonable and necessary. One thing I observed about Corrections Supervisor I Hopkins' use of the pepper ball gun was that he discharged more pepper balls than the other officer, Corrections Supervisor I Tanner Lang. The video reflects that Hopkins stepped away from the wire enclosure, which would make it harder for Mr. Cheatham to grab the barrel of the gun, but it also meant that a number of the pepper balls struck the wire and exploded or deflected at that point. The fact that he used more pepper balls was not unreasonable or excessive under those circumstances.

10. Generally speaking, the device that is used to project the pepper balls is similar in technology to the guns that fire paintballs and the paintballs and pepper balls are similar also except for the substance in the balls. They can cause bruising, but are not similar to bean bags nor to risks associated with beanbags. While compliance with orders is encouraged by both the chemical in the pepper balls and by the pain caused by being shot with one, the pain is not significant when compared with other options.

11. Mr. Cheatham was not compliant until after the second round of pepper balls were utilized. In between each use Mr. Cheatham was asked to submit to restraints and he declined to do so. There was a brief delay to allow time for the chemical to take effect during each pause. When he did finally raise his hands and allow himself to be restrained, the use of the pepper ball guns ceased.

12. My approval of the use of force against Mr. Cheatham and the use of force itself were a correct, reasonable and appropriate response to the situation. The decision to use the pepper ball guns instead of rushing in to physically restrain Mr. Cheatham was the best for all involved. Both security staff and Mr. Cheatham could have been injured in such a case. As it was, Mr. Cheatham received only the most minor of injuries, no staff were injured and Mr. Cheatham received immediate medical care and confirmed to the nurse that he was alright. This use of force was not used purely to cause Mr. Cheatham pain, but was intended to restore discipline to the area and to allow the exercise yard to return to normal after he was returned to his living area or, in this case, placed in crisis level housing.

13. Any actions I took or approved regarding Mr. Cheatham were performed within the course and scope of the duties of my position with State of Kansas Department of Corrections, and not in any personal or non-business capacity.

FURTHER AFFIANT SAITH NOT!

_____
Tim Easley, Warden

Subscribed and sworn to before me this 20th day of January, 2026.

NOTARY PUBLIC - State of Kansas
CARLA LILE
My Appt Expires 12-11-27

_____
Notary Public