IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**FILED**
**U.S. District Court**
**District of Kansas**
04/15/2026

**Clerk, U.S. District Court**
**By:__JAL__Deputy Clerk**

RYAN CHRISTOPHER CHEATHAM,

**Plaintiff,**

v.                                    CASE NO.  25-3241-JWL

TIM EASLEY, et al.,

**Defendants.**

**MEMORANDUM AND ORDER**

Plaintiff filed this pro se civil rights action under 42 U.S.C. § 1983.  Although Plaintiff is currently incarcerated at the El Dorado Correctional Facility in El Dorado, Kansas ("EDCF"), the events giving rise to his claims occurred at the Larned State Correctional Facility in Larned, Kansas ("LSCF").  The Court granted Plaintiff leave to proceed in forma pauperis.  On December 22, 2025, the Court entered a Memorandum and Order (Doc. 6) ("M&O") finding that the proper processing of Plaintiff's claims could not be achieved without additional information from appropriate Kansas Department of Corrections ("KDOC") officials.  The Court's M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1015A."  (Doc. 6, at 6.)  The *Martinez* Report (Docs. 11, 13, 16) (the "Report") has now been filed.  The Court's screening standards are set forth in the Court's M&O.

 I.  **Nature of the Matter before the Court**

Plaintiff alleges that on July 4, 2025, Warden Easley, Major Graham, and Captain Bieberle ordered or approved a use of force on Plaintiff at LSCF.  (Doc. 1, at 3.)  Plaintiff alleges that his hands were in the air in a submissive position and Officer Cobb ordered the deployment of pepperball projectiles.  *Id*.  Plaintiff alleges that Officers Hopkins and Ford were the two active shooters.  *Id*.  Plaintiff alleges that he "was facing opposite of the two officers shooting with [his]

back facing them and hands up." *Id*. at 3, 5. Plaintiff alleges that "officers who disagreed with the amount of force used stated there was over 100 shots." *Id*. at 5. These officers stated that once Plaintiff's hands were up, he should have been told to step to the bean port to be cuffed up or told to get down on the ground. *Id*. These officers also told Plaintiff that other options were available where Plaintiff did not have a weapon in his hands at the time the shots started. *Id*. Plaintiff claims that he was bleeding and bruised, and sustained injuries to his back and the back of his head. *Id*.

As Count I, Plaintiff alleges excessive force in violation of the Eighth and Sixth Amendments. *Id*. at 4. As Count II, Plaintiff alleges cruel and unusual punishment in violation of the Eighth Amendment. *Id*. As Count III, Plaintiff alleges deliberate indifference in violation of the Eighth Amendment. *Id*. at 6.

Plaintiff names as defendants: Tim Easley, LSCF Warden; (fnu) Graham, LSCF Major; (fnu) Bieberle, LSCF Captain; (fnu) Cobb, Correctional Officer ("CO") at LSCF; (fnu) Hopkins, LSCF CO; and (fnu) Ford, LSCF CO. For relief, Plaintiff seeks $500,000 in damages and punitive damages for emotional and mental damages. *Id*. at 7.

## II. The Report

The Report addresses the use of force against Plaintiff at LSCF on July 4, 2025. The Report provides that:

> Use of Force Report 2026-08-0001 covers the use of force against plaintiff beginning at 7:40 a.m. on July 4, 2025, at LSCF after plaintiff refused to allow himself to be restrained when it was time for him to leave the segregation exercise yard. Six facility staff were involved and were identified as Corrections Officer I Tyler Madewell, Correction Officer II Odane Bernard and Correction Supervisor Is Tanner Lang, Anthony Hopkins, Jacob Ford and Aaron Cobb. NOTE: Only CSIs Jacob Ford, Anthony Hopkins and Aaron Cobb are named as defendants. The planned use of force was authorized by Tim Easley and discussed with Ron Bieberle, who was the shift supervisor. These two are also named as defendants. (Exhibits 2, 4 and 14)

2

The entire event is recorded by audio and video by Corrections Supervisor II Angie Lines. (Exhibits 5, 8, 14 and 17-18)

Three photographs were also taken by Aaron Cobb immediately after the use of force and three more were taken while plaintiff was in crisis level cell. (Exhibit 19 and 20)

The reason for the use of force was because at around 7:40 a.m. plaintiff refused to be restrained and returned to segregation. Plaintiff had a weapon (wire from the fencing wrapped around his fingers) and plaintiff threatened staff if they entered his exercise area. (Exhibits 2, 5(Attachment A), 12 and 14)

All other inmates were ultimately removed from the exercise yard, which was a series of wire fence enclosures. (Exhibit 12)

A series of staff attempted to negotiate with plaintiff to allow himself to be restrained and to return to his living unit. CSII Lines first negotiated with plaintiff from 7:33 a.m. to 7:44 a.m. and again from 9:50 a.m. to 9:55 a.m.. CSI Cobb negotiated with plaintiff from 8:32 a.m. to 8:50 a.m. and CSIII Bieberle also engaged plaintiff from 8:39 a.m. to 8:45 a.m.. Plaintiff was allowed to remain in the exercise yard for an extra hour until 9:00 a.m. Lastly, corrections Officer I Kim Converse began negotiations at 9:57 a.m.. Negotiations were determined to have failed at 10:01 a.m.. Plaintiff indicated he would not cooperate and return to his room. Plaintiff was now ignoring the negotiator, was chanting loudly and would not make any eye contact with her. Plaintiff had also wrapped his head and face to protect against OCS spray from getting in his eyes and was wearing extra clothing. The negotiator stepped away. (Exhibits 2, 4, 5, 8, 9, 12, 14, 17 and 18)

The security videos show the entire use of force including the assembly of the team, the final negotiation, the uses of force, the movement of plaintiff from the enclosure to his decontamination shower, the medical check and, in the second short video, to his crisis level cell. (Exhibits 17 and 18)

The first volley of pepper balls were deployed by CSIs Hopkins and Lang at 10:02 a.m.. CSI Lang indicated he deployed 6 rounds into plaintiff's torso and upper arms. Plaintiff refused to be restrained. A second volley was deployed at 10:04 a.m.. CSI Lang deployed another 6 rounds to plaintiff's upper torso. Plaintiff still refused to be restrained. A third volley was deployed at 10:05 a.m. and plaintiff complied, allowing wrist and ankle restraints to be applied.. Plaintiff was removed from the exercise yard at 10:09 a.m. and taken to housing unit COU-5. Plaintiff's clothing was removed and he was given a security gown and security blanket. Plaintiff received a 10 minute decontamination shower. (Exhibits 6, 10, 12, 14, 17 and 18)

CSI Lang returned 78 pepper balls to Central after deploying 12 pepper balls. CSI Hopkins deployed 55 pepper balls overall and

returned 35 pepper balls to Central. It appeared that only a handful of the pepper balls actually got through the fence intact so they impacted on plaintiff. (Exhibits 6, 10, 14, 17 and 19)

Neither plaintiff nor staff reported any injury. Plaintiff refused medical treatment in a statement to Registered Nurse Williams, stating specifically that "I'm good Ms. Williams, I'm good.". The use of force report and attached medical record both contain a copy of the four page record with that information. The medical record contained no other mention of injury or treatment of plaintiff related to this use of force so far as counsel could determine. The medical record from June 1, 2025, to present is also attached. The relevant four page medical record is attached to the use of force report. (Exhibits 5, 13, 14, 15 and 17)

Plaintiff was placed on a four day suicide observation. (Exhibit 16)

* * * *

Plaintiff sued Defendant Warden Tim Easley (Easley) because Easley approved the use of force to be conducted against plaintiff. Easley agrees that he did approve the use of force against plaintiff and engaged in further discussion with Defendant Captain Ronald Bieberle on various matters including the type of force to be used.

The exercise area is a series of wire enclosures. Options for uses of force included chemical spray, pepper balls and physical intervention. The spray was not the best selection because it was in open air and would dissipate quickly and could contaminate the entire exercise area, requiring significant clean up before the area could be used again. Physical intervention was not a preferred option for a variety of reasons. The enclosure was large enough that plaintiff could run around and avoid the five man team, as well as risking injury to staff from the physical confrontation. The physical approach works much better in small, confined cell areas. The use of pepper balls seemed best because it could be better focused on plaintiff, would have much less clean up and the risk of injury to staff was minimized.

Plaintiff should have been returned to his living unit a little after 7:00 a.m., but it was after 10:00 a.m. before force was actually used. We tried to give plaintiff time to change his mind and voluntarily return to his living unit, but he came to the exercise area with the apparent intent to engage in a use of force, based on his choice to wear extra clothing and by concealing his face to protect against the use of chemical agents.

Beside allowing him to remain long past the scheduled time for him to leave the exercise yard, four different staff attempted to

negotiate with plaintiff to leave voluntarily. Lt. Lines spoke with plaintiff from 7:33 a.m. to 7:44 a.m., M. Sgt Cobb from 8:32 a.m. to 8:50 a.m., Captain Bieberle from 8:39 a.m. to 8:45 a.m., Lt. Lines again from 9:50 a.m. to 9:55 a.m. and finally COI Converse from 9:57 a.m. to 10:01 a.m.. Even as the team appeared and the use of force began, CSI Cobb asked plaintiff to allow restraints to be placed on him, and multiple times thereafter, even allowing more time to pass, hoping the delay would change plaintiff's mind.

Pepper ball technology is much like paintballs except for the contents when the balls burst. The guns firing the pepper balls are similar to paintball guns. The pepper balls can cause some bruising, but the risk of serious injury, as might be the case with bean bags, is not the same. And, pain compliance combined with the contents of the pepper balls has proven effective.

CSI Lang and CSI Hopkins did deploy a series of pepper balls and then waited two minutes for the chemical to take effect. Plaintiff was again asked to cuff up and refused. A second volley was utilized and plaintiff seemed for a moment like he was going to comply, then walked away from the door through which he would have been restrained. More pepper balls were fired by CSI Hopkins and plaintiff gave up and agreed to be restrained. No further pepper balls were fired once he complied with instructions and was then restrained.

Plaintiff's choice to remain in the exercise yard past his allowed time interfered with the schedules for other inmates to use the area and required additional staff to supervise and move other inmates out of the area before the use of force was conducted.

A use of force review committee comprised of Warden Easley and senior staff from a variety of departments looked at video of the situation as it unfolded and concluded the force used was both reasonable and necessary.

Warden Easley's approval of the use of force against plaintiff and the use of force itself were a correct, reasonable and appropriate response to the situation. The decision to use the pepper ball guns instead of rushing in to physically restrain plaintiff was the best for all involved.

Both security staff and plaintiff could have been injured in such a case. As it was, plaintiff received only the most minor of injuries, no staff were injured and plaintiff received immediate medical care and confirmed to the nurse that he was alright. This use of force was not used purely to cause plaintiff pain, but was intended to restore discipline to the area and to allow the exercise yard to return to normal after he was returned to his living area or, in this case, placed in crisis level housing. (Exhibit 2)

(Doc. 11, at 4–9.)

The Report provides that Warden Easley was the one that authorized the use of force, and neither Major James Graham nor Captain Ron Bieberle authorized the use of force against Plaintiff. *Id*. at 7, 9. Captain Bieberle was aware of the situation and did discuss it with Warden Easley. *Id*. at 9. It appeared that other inmates in the exercise area may need to be restrained, but they cooperated and allowed themselves to be restrained. *Id*.

The Report provides that Plaintiff received a disciplinary report on July 4, 2025, directly related to his refusal to leave the segregation exercise area. *Id*. at 16. "Plaintiff received report 25-0545 for disobeying orders and threatening or intimidating at 7:50 a.m. on July 4, 2025" and pled guilty to both charges *Id*. (citing Exhibit 12.)

The medical records submitted with the Report show that Plaintiff was seen by medical after his decontamination shower following the incident. (Exhibit 13, at 61.) The medical record for July 4, 2025, provides that Plaintiff stated "I'm good Ms. Williams, I'm good" and denied any issues, problems or concerns at that time. *Id*. at 62. The medical record also states that Plaintiff was "joking and laughing with staff about incident. Noted several areas of circular bruising from pepper balls deployed. Pt denied any pain or discomfort at this time." *Id*. at 63. Plaintiff's July 17, 2025 medical record indicates that he complained of sharp pains in his back and down his left foot when he moves certain ways. *Id*. at 124.

## III.  DISCUSSION

Plaintiff alleges excessive force in violation of the Eighth and Sixth Amendments. He also claims "cruel and unusual punishment" and "deliberate indifference." Plaintiff does not have an excessive force claim under the Sixth Amendment. Plaintiff's claim of excessive force, cruel and unusual punishment, and deliberate indifference are all the same claim under the Eighth Amendment. *See Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (stating that

"claims of excessive force involving convicted prisoners arise under the Eighth Amendment"). The Eighth Amendment's prohibition against "cruel and unusual punishments" applies to the treatment of inmates by prison officials. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986). Prison officials violate inmates' Eighth Amendment rights when they subject them to the "unnecessary and wanton infliction of pain." *Id*. at 319.

Plaintiff must prove both an objective component and subjective component to succeed on an excessive force claim. *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003). To establish the objective component, Plaintiff must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id*. Not every isolated battery or injury to an inmate amounts to a federal constitutional violation. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (stating that not "every malevolent touch by a prison guard gives rise to a federal cause of action") (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")). "Physical injury is not required, but the force must be 'objectively harmful enough to establish a constitutional violation[.]'" *Blake v. Wallace*, 2024 WL 5087805, at *3 (10th Cir. 2024) (unpublished) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010); *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10.

To establish the subjective component, Plaintiff must show that Defendants "act[ed] with a sufficiently culpable state of mind." *Cochran*, 339 F.3d at 1212 (citation omitted). "In order to establish such a claim, a prisoner must demonstrate that the defendant officials engaged in the

'unnecessary and wanton infliction of pain.' " *Reed v. Smith*, 1999 WL 345492, at *4 (10th Cir. 1999) (citation omitted). "An official's state of mind is sufficiently culpable 'if he uses force maliciously and sadistically for the very purpose of causing harm, rather than in a good faith effort to maintain or restore discipline.'" *Ezell v. Hininger*, 2024 WL 1109057, at *2 (10th Cir. 2024) (unpublished) (citing *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018) (internal quotation marks omitted)). "Factors to be considered include the officers' reasonable perceptions of the threat and the 'relationship between that need and the amount of force used' and efforts to temper such force." *Blake*, 2024 WL 5087805, at *3 (citing *Hudson*, 503 U.S. at 7).

The Court has viewed the videos submitted as exhibits to the Report. The videos do not support Plaintiff's claims. The videos reflect that a designated negotiator was used to attempt negotiations with Plaintiff prior to the use of force. Negotiator Kim Converse asked Plaintiff to cuff up. Plaintiff is singing with his head and face covered and does not respond to her. She asks if he is okay with the use of force and he continues to sing and refuses to talk to her. After a few minutes she states to the camera that negotiations failed at 10:01 a.m.

Officers then approach Plaintiff and state that they are giving him his last opportunity to cuff up. Plaintiff briefly raises his arms with his back to them, and then puts his arms down. They fire rounds from the pepperball gun and Plaintiff does not respond. The Officers continue to ask Plaintiff if he will cuff up. They fire another round and Plaintiff coughs and starts singing again. Plaintiff states that this is a first, he's never been hit with these before, and that they "stung." Plaintiff continues singing and walking around the fenced area. Plaintiff states to the officers that it is nothing personal and he's making a statement. Plaintiff asks if there is going to be a "round two or what are we doing?" Plaintiff asks if they are "going again" and laughs. The officers state that they are giving Plaintiff another opportunity to cuff up. Plaintiff moves back and forth,

ducking down and up to avoid the pepperballs, and more are deployed.  Plaintiff then states that he will cuff up.  The officers tell him to go to the door/gate to cuff up, but Plaintiff doesn't move to the door.  The officers state that they will deploy again if Plaintiff does not come over to them to cuff up.  They deploy a few more rounds and Plaintiff does not go to the door.  Plaintiff has his face covered so officers tell him to move to the right to be cuffed up.  They tell him to keep moving backwards to cuff up.  They deploy more and Plaintiff finally goes to the door to cuff up.

As the officers escort Plaintiff from the exercise yard he begins singing again.   They take him to the shower to decontaminate.  While showering, Plaintiff appears to be joking with others about the incident and laughing.  He is then taken to be assessed by medical staff.  While being assessed by the nurse, Plaintiff is joking with the officers about the incident[1] and he tells the nurse he's good. An officer takes photos of Plaintiff.

Courts have held that a plaintiff's refusal "to obey direct orders given multiple times" supports a clear need for force.  *Pittman v. Roetker*, 2025 WL 753630, at *4 (D. Colo. 2025).  "[P]risoners cannot be permitted to decide which orders they will obey, and when they will obey them." *Id*. (quoting *Redmond*, 882 F.3d at 938 (citation and internal quotation marks omitted)).  In *Moody v. Cory*, the Court considered the use of a pepperball gun and found that plaintiff's allegations were insufficient to state a federal constitutional violation and that the facts suggested that force was applied in a good faith effort to maintain or restore discipline.  *Moody v. Cory*, 2010 WL 147268, at *4 (D. Kan. 2010).  The Court stated that "Plaintiff's own allegations indicate he was banging on his door, his behavior caused a team of officers to come to his cell to quell the disturbance, and he did not verbally respond when told to cuff up. Under these circumstances, the use of some physical force can hardly be considered repugnant to the conscience of mankind."  *Id*.

---

[1] In his memorandum at Doc. 22, Plaintiff claims that after the incident he was "patronizing staff because he knew they intended to hurt him and he wasn't going to show they did."  (Doc. 22, at 7.)

Plaintiff pleaded guilty to the disciplinary report he received for disobeying orders and threatening or intimidating. *See* Doc. 11–12. The disciplinary report provides that when asked to return to his room, Plaintiff:

> replied that he was not cooperating and had already wrapped his head and face to keep from getting OCS spray in his eyes. Everyone else was removed from yard and Cheatham still refused to come out of the yard. He had pulled wires off the fencing on the top of the cage and wrapped the wires around his fingers so he could be ready when the SORT members came in on him.

*Id*. at 1. The report provides that Plaintiff entered a plea of guilty. *Id*. at 4, 12. *See Wilson v. Wilcox*, 2018 WL 1304532, at *6 (D. Colo. March 13, 2018) ("Because the disciplinary determination is inconsistent with some of Mr. Wilson's allegations . . . the factual findings in the disciplinary determination control, both under *Heck* and consistent with the doctrine of collateral estoppel.") (citing *Martinez v. City of Albuquerque*, 184 F.3d 1123, 1127 (10th Cir. 1999)).

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir. 1983)). Thus, at this point in the proceedings the Court does not use the Report to resolve conflicts of fact. *See Swoboda v. Duback*, 992 F.2d 286, 290 (10th Cir. 1993) ("In determining whether a plaintiff has stated a claim, the district court may not look to the Martinez report, or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes."). However, the Tenth Circuit has held that "[w]here the video evidence blatantly contradicts a material fact allegation, we may disregard that allegation in favor of what is actually depicted on the video." *Blake v. Wallace*, 2024 WL 5087805, at *2 (10th Cir. Dec. 12,

2024) (unpublished) (citation omitted).   In light of the Report, the Court is considering dismissal of this matter for failure to state a claim.  Plaintiff has already filed a response to the Report, despite the Court's order to refrain from doing so until the Court had an opportunity to review the Report.  The Court will grant Plaintiff an opportunity to supplement the response that he filed and to show good cause why his Eighth Amendment claim should not be dismissed for failure to state a claim.

## IV.  Motions

The Court's M&O provides that "[n]o motion or other document addressed to the Complaint shall be filed until the Court has reviewed the *Martinez* Report and entered an order screening the Complaint."  (Doc. 6, at 9.)  Despite the Court's order, Plaintiff has filed multiple documents, including seven motions, a response, a supplement, and a memorandum in support.

**A.  Motion for Plaintiff to Receive a Personal Laptop With Legal Affair Access Only (Doc. 15)**

Plaintiff asks the Court to order EDCF to provide him with "a personal laptop with limited access to conduct his legal affairs only."  (Doc. 15, at 1.)  Plaintiff claims that he currently does not have a law library tablet to conduct legal research.  *Id*.  He also states that he would like the laptop to have access to ChatGPT.  *Id*.  Plaintiff indicates that he would only use the laptop for his legal work and if he abuses it they can confiscate it.  *Id*. at 1–2.  He also asks that the laptop have access to allow him to have video conferences with any future attorney that might represent him. *Id*. at 2.

Plaintiff's motion seeks injunctive relief.  To obtain a preliminary injunction, the moving party must demonstrate four things: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tip in the movant's favor; and (4) that the injunction is in the public interest.  *Little v.*

*Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010).  "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A preliminary injunction is appropriate only when the movant's right to relief is clear and unequivocal.  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

A federal court considering a motion for preliminary injunctive relief affecting the conditions of a prisoner's confinement must give "substantial weight to any adverse impact on public safety" and on prison operation.  18 U.S.C. § 3626(a)(2).  Finally, a mandatory preliminary injunction, such as the one sought by Plaintiff, which requires the non-moving party to take affirmative action, is disfavored and therefore requires the moving party to make a heightened showing of the four factors above.  *Little*, 607 F.3d at 1251.  Because preliminary injunctions and TRO's are drastic remedies—"the exception rather than the rule—plaintiffs must show that they are clearly and unequivocally entitled to relief." *Adrian v. Westar Energy, Inc.*, No. 11-1265-KHV, 2011 WL 6026148, at *3 (D. Kan. 2011) (citations omitted).

"State inmates do not have a federal constitutional right to possess computers or access the internet." *Duenes v. Wainwright*, 2017 WL 6210904, at *3 (W.D. Tex. Dec. 7, 2017) (citations omitted).  "The federal courts that have considered the issue of a right to use a computer have reasoned that, because prisoners have no federal constitutional right to possess a typewriter, they logically do not have a constitutional right to a computer." *Id.* (citing *Taylor v. Coughlin*, 29 F.3d 39, 40 (2d Cir. 1994); *Sands v. Lewis*, 886 F.2d 1166, 1169 (9th Cir. 1989); *American Inmate Paralegal Assoc. v. Cline*, 859 F.2d 59, 61 (8th Cir. 1988) ("Prison inmates have no constitutional

12

right of access to a typewriter."); *Lehn v. Hartwig*, 13 F. App'x 389, 392 (7th Cir. 2001) (holding, in a section 1983 action, "If prisoners have no constitutional right to a typewriter, they certainly do not have one to a computer"); *see also Robinson v. Joya*, 2010 WL 1779885, at *3 (E.D. Cal. 2010) (stating, in a section 1983 action, "No court has found that prisoners have a constitutional right to possess personal computers, or items that are similar to personal computers, in their cells.").

Plaintiff is not alleging that a laptop or tablet containing his legal materials was taken from him. Instead, he seeks to be provided with a laptop for future use. *See Vreeland v. Vigil*, 2021 WL 229288, at *4–5 (D. Colo. 2021) (addressing the return of a tablet that plaintiff had used since 2016 and which contained the plaintiff's research and draft pleadings). Plaintiff has failed to show that he will suffer irreparable harm if he is not provided with a laptop. *See Bell v. Washington*, 2023 WL 6438597, at *5 (6th Cir. 2023) ("The district court did not abuse its discretion by denying Bell's motion for an injunction requiring prison officials to permit him to purchase and possess a laptop and accessories for litigation purposes and to email legal documents. Bell had not demonstrated a likelihood of success on the merits or that he would suffer irreparable harm. By the time that Bell sought an injunction, he had prepared and filed many documents, including his response to the summary-judgment motion."); *see also Hedgespeth v. Bartow*, 2009 WL 3617485, at *2 (W.D. Wis. 2009) (denying injunctive relief where "plaintiff has not alleged that irreparable harm will occur if defendant Watters does not provide him with a laptop"); *Hay v. Davis*, 2020 WL 8678306, at *1 (S.D. Tex. 2020) (denying injunctive relief and finding no irreparable harm where plaintiff—who suffers from osteoarthritis and swelling in his hand that make writing at length difficult and uncomfortable—has no "constitutional right to be provided a personal laptop with voice recognition software and a printer with paper").

Plaintiff has not shown that he will suffer irreparable harm if he is denied the requested relief.  Plaintiff's motion is denied.

**B.  Motion to Strike and Plaintiff's Objection to the Witness Statement #9 Anthony Hopkins (Doc. 17)**

Plaintiff states that he objects to the witness statement #9 Anthony Hopkins and asks the Corut to strike #9.  (Doc. 17, at 1.)  Plaintiff argues that Officer Hopkins states that he stepped back from the fence to be sure Plaintiff was not able to grab the barrel of the weapon.  *Id*.  Plaintiff claims that the statement is not based on personal knowledge, contains hearsay, is conclusory, and lacks foundation.  *Id*.  Plaintiff claims that the video will show that his hands were up and his back was facing the shooters.  *Id*.  He also claims that there was a fenced wire cage separating him from the officers and therefore there was no way Plaintiff could grab the gun.  *Id*.  Plaintiff asks the Court to strike the statement.  *Id*.  The Court is granting Plaintiff an opportunity to respond to the Report, including affidavits submitted with the Report.  The motion is denied.

**C.  Response to Martinez Report (Doc. 18)**

In his response, Plaintiff takes issue with the statement in the Report that "Plaintiff had a weapon (wire from the fencing wrapped around his fingers) and plaintiff threatened staff if they entered his exercise area."  (Doc. 11, at 5,)  Plaintiff claims that this statement is used as a reason for the use of force and that he "wasn't armed with weapons and told [Officer] Cobb long before the incident that he wasn't trying to fight the officers and catch more time" and that he "picked up the wires located on the ground and handed them to Officer Cobb."  (Doc. 18, at 1.)

The Report indicates that Plaintiff had the wire around 7:40 a.m. when he was refusing to be restrained and returned to segregation.  (Doc. 11, at 5.)  The Report cites Exhibits 2, 5

14

(Attachment A), 12, and 14. *Id*. Plaintiff has not disputed that he had the wire earlier in the day. Plaintiff should address this in his Response.

Plaintiff also controverts the assertion in the Report that Plaintiff did not seek medical care after the incident. (Doc. 18, at 1.) Plaintiff claims that he put in sick calls regarding sharp pains in his back and foot. *Id*. Plaintiff claims that he was not ordered to cuff up once his hands were up, and the officers starting shooting both times when his hands were up. (Doc. 18, at 2.)

Plaintiff also controverts Officer Hopkins's statement that he stepped back from the fence to be sure that Plaintiff was not able to grab the pepperball gun. (Doc. 18, at 2.) Plaintiff claims that his back was toward the officers with his hands up and the fence had wire squares that would not allow him to grab the gun. *Id*.

The Court is granting Plaintiff another opportunity to respond to the Report and to show good cause why his Eighth Amendment claim should not be dismissed for failure to state a claim.

**D.  Motion for Objection Under Rule 56(c)(4) to the "Contact Chrono Report" Submitted by the Defendants in the Martinez Report (Doc. 19)**

Plaintiff claims that the "Contact Chrono Report" submitted with the *Martinez* Report is irrelevant to the incident on July 4, 2025. (Doc. 19, at 1.) Plaintiff claims that he believes the document was provided to "distract the courts from the relevant task and attempt to persuade the court in a negative direction." *Id*. Plaintiff states that he objects to the admission of the Contact Chrono Report. *Id*.

Rule 56 deals with summary judgment motions. This case has not passed screening, Defendants have not been required to answer, and Defendants have not filed a motion for summary judgment. The Court did not rely on the Contact Chrono Report in reviewing the Report and issuing this Memorandum and Order. The motion is denied.

### E. Supplement (Doc. 20)

Plaintiff has filed a supplement to his response to the Report. (Doc. 20.) He attaches an "Exhibit 2" in support of his response. *Id*. at 2. His Exhibit 2 is two handwritten sentences providing "AAR. Discuss positive results and multiple staff negotiating and staff remaining patient. Work to improve amount of pepperball used for force." *Id*. Plaintiff claims that these statements were part of the documented Report 2026-08-001 and are contrary to Warden Easley's position that Officer Hopkins's use of 55 shots was not excessive. *Id*. at 1.

### F. Motion to Expedite Summary Judgment (Doc. 21)

Plaintiff seeks to expedite summary judgment in this matter, claiming there are no genuine issues as to any material fact and that he is entitled to judgment as a matter of law. (Doc. 21, at 1.) Plaintiff then sets forth his description of the incident as captured on video. *Id*. at 1–4. Plaintiff claims that no discovery is needed because the incident was captured on video. *Id*. at 4. Plaintiff states that he "wishes to dismiss those from the case who this court deems had no personal participation." *Id*.

This case has not passed screening and any request for expedited summary judgment is premature. Plaintiff is being given an opportunity to respond to the Report and to show good cause why his Eighth Amendment claim should not be dismissed for failure to state a claim. Plaintiff's motion is denied as premature.

### G. Memorandum in Support of Motion for Summary Judgment (Doc. 22)

Plaintiff filed a memorandum in support of his motion for summary judgment. (Doc. 22.) Plaintiff cites case law in support of his motion for summary judgment and includes the same "Exhibit 2." *Id*. at 9. As set forth above, the motion is being denied as premature. Plaintiff should include any arguments in his response to the Report ordered in this Memorandum and Order.

**H. Motion to Courts for Permission to Obtain a Copy of the "use of force video" and/or Remove Protective Order/Seal (Doc. 23)**

Plaintiff seeks to obtain a copy of the use of force video to enable him to obtain counsel. (Doc. 23, at 1.)  He claims that he is currently acting as his own lawyer.  *Id*.   He also wants to make the video public to provide awareness of what transpired on July 4, 2025.  *Id*. at 2.  Plaintiff also requests a hearing on the matter if possible.  *Id*.

The motion to file the videos under seal and conventionally provides that "[i]n the last part of the video, plaintiff's clothing is removed. This should not be made a part of the public filing for that reason. Plaintiff will be allowed to view the videos, but not possess the thumb drive for security reasons." (Doc. 12, at 2.)  The Court granted the motion at Doc. 12.  (Doc. 14.)  Therefore, Plaintiff should request assistance from staff to view the videos.  Plaintiff's motion is denied.

**I.  Motion for Preliminary Injunction (Doc. 25)**

Plaintiff seeks a preliminary injunction, alleging that the KDOC is retaliating against him by freezing the funds in his inmate account.  The claims in this case relate to a single instance of an alleged use of force at  LSCF.  Plaintiff is no longer housed at LSCF and any claim he believes he has regarding his inmate account or retaliation are unrelated to the claim in this case.  Plaintiff should raise this claim in a separate action after he has exhausted his administrative remedies on the claim.  The motion is denied.

**J.  Motion for Default Judgment (Doc. 26)**

Plaintiff asks the Court to enter a default judgment against Defendants for their failure to respond to his motion for summary judgment.  (Doc. 26, at 1.)  As set forth above, Plaintiff's motion seeking summary judgment is denied as premature.  The Court's M&O ordered KDOC official to submit a *Martinez* Report and provides that "[i]f the Complaint survives screening, the

Court will enter a separate order setting an answer deadline.  Therefore, any answer deadline provided in the docket entry for the waiver of service is not controlling." (Doc. 6, at 8.)   The M&O also provides that "[n]o motion or other document addressed to the Complaint shall be filed until the Court has reviewed the *Martinez* Report and entered an order screening the Complaint." *Id*. at 9.  Therefore, no answer has been ordered and Plaintiff's motion seeking summary judgment is denied as premature.  Plaintiff is not entitled to a default judgment and his motion is denied.

## V.  Response Required

Plaintiff is given an opportunity to respond to the Report and to show good cause why his Eighth Amendment claim based on excessive force should not be dismissed.  Failure to respond by the Court's deadline may result in dismissal of this action without further notice for failure to state a claim.  Plaintiff is directed to refrain from filing anything other than the response ordered in this Memorandum and Order.

**IT IS THEREFORE ORDERED** that Plaintiff is granted until **May 14, 2026,** in which to respond to the Report at Doc. 11, and to show good cause, in writing to the undersigned, why Plaintiff's Eighth Amendment excessive force claim should not be dismissed for the reasons stated herein.

**IT IS FURTHER ORDERED** that Plaintiff's motions (Docs. 15, 17, 19, 21, 23, 25, and 26) are **denied.**

**IT IS SO ORDERED**.

Dated April 15, 2026, in Kansas City, Kansas.

**S/  John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**